An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the *North Carolina Rules of Appellate Procedure*.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-93

Filed 5 November 2025

Davidson County, No. 22JT000161-280

IN THE MATTER OF: O.R.L.

Appeal by Respondent-Father from order entered 8 October 2024 by Judge Jon Welborn in Davidson County District Court. Heard in the Court of Appeals 24 September 2025.

> *Brinkley Walser Stoner, PLLC, by Attorney Danielle DeAngelis, for the petitioner-appellee Davidson County Department of Social Services.*
>
> *Parry Law, PLLC, by Attorney Edward Eldred, for the respondent-appellant Father.*
>
> *Chapman and Cutler, LLP, by Attorney Erica Morgan Hicks, for the appellee Guardian ad Litem.*

STADING, Judge.

Respondent-Father ("Father") appeals from the trial court's order terminating his parental rights to O.R.L. ("Orla").[1] On appeal, Father challenges several adjudicatory findings as unsupported by clear, cogent, and convincing evidence. He also maintains the trial court erroneously concluded there were grounds supporting

---

[1] We use pseudonyms to protect the identity of the minor child. N.C. R. App. P. 42(b) ("Appeals filed under N.C. [Gen. Stat.] § 7B-1001 . . . must use initials or a pseudonym instead of the minor's name.").

termination of his parental rights at the adjudicatory phase of the proceeding. After careful consideration, we affirm the trial court's order.

## I.   Factual & Procedural Background

Father and Respondent-Mother ("Mother") are the natural parents of Orla and two other minor children—D.L.L. ("Dom") and G.J.L. ("Gus").[2]  Although the record references all three minor children as well as Mother,[3] the instant appeal solely concerns the termination of Father's parental rights over Orla.

The record tends to show that on 1 August 2022, Mother "filed a restraining order" against Father "due to a prior domestic violence altercation[.]"  The altercation involved Father attacking Mother in the presence of the minor children as described:

> [Mother] filed a restraining order against . . . [Father] for herself and on behalf of the minor children due to a domestic violence altercation that occurred between the respondent parents on July 29, 2022.  [Father] became angry with [Mother] when she attempted to leave for the store and got into the car with her and the children. [Father] reached across the mother as they were driving down the road, opened her car door, and attempted to push the mother out of the car while the car was moving.  When [Father] stopped at a stop sign, the respondent mother attempted to flee the car, but [Father] grabbed her by her hair and took off driving again.  When they returned home, [Father] pushed the respondent mother down several times and called her names such as "stupid" and "whore." The respondent mother reported that [Father] has previously punched her in the face breaking her nose . . . and has hit and yelled at the respondent mother in the presence of the

---

[2] Neither Dom nor Gus are parties to this case—only Orla.

[3] Mother did not appeal from the trial court's termination order.

minor children.

Consequently, Mother and the minor children stayed in a local domestic violence shelter for several weeks.

A few weeks later, on 18 September 2022, an officer with the Lexington Police Department was driving behind Mother's sport utility vehicle ("SUV") when the trunk flew open. At the time, Mother was driving all three minor children. The officer observed Gus unbuckled in the "trunk/storage space of the . . . SUV," prompting him to pull Mother over. Upon approaching Mother's SUV, the officer also saw Dom "unbuckled in the front seat." Although Orla was properly secured in a car seat, both Gus and Dom were "unsecured" and "wearing only their underwear." At the conclusion of the traffic stop, the officer arrested Mother for her failure to appear in court for a possession of drug paraphernalia charge. As a result, the minor children "left the scene" with their paternal uncle.

The next morning, 19 September 2022, Father and Mother rode together to drop Gus off at school notwithstanding Mother's domestic violence protective order against Father; Orla was also in the vehicle. Upon arrival, both Mother and Father "appeared to be under the influence drugs." The school's staff therefore proceeded to contact the Davidson County Sheriff's Office. Father "had slurred speech and was unable to provide any information when asked" by a social worker. He "was having trouble keeping a consistent conversation and was rambling when asked any questions." When asked for potential placement providers for the children, Father

repeatedly stated, "ask her," referring to Mother. Mother "had sores covering her arms and face" and "was very fidgety, sway[ing] back and forth." She also had "trouble keeping a consistent conversation and lost track of her thoughts as she was talking." Throughout this episode, Mother "was so unsteady on her feet [that] school personnel held [Orla] because . . . she was unable to do so." The parents ultimately "admitted they had taken methadone at the methadone clinic earlier in the morning prior to taking the children to school." At this time, Father was arrested for "violating the domestic violence protective order between himself, the respondent mother and the minor children."

On 20 September 2022, the Davidson County Department of Social Services ("DSS") filed a petition, alleging that Dom, Gus, and Orla were neglected and dependent juveniles.[4] The petition stated that Mother and Father: did not provide proper care, supervision, or discipline; created or allowed to be created a living environment injurious to the juveniles; were unable to provide for the juveniles' care or supervision; and lacked an appropriate alternative childcare arrangement for the juveniles. After a hearing on 7 December 2022, the trial court adjudicated the minor children as neglected and dependent, and set the following case plan for Father:

> 5. . . . [Father] shall complete a Comprehensive Clinical

---

[4] In addition to the incidents described above in the background section of this opinion, DSS "worked with the family numerous times since 2013 due to concerns of substance abuse, domestic violence, supervision, the condition of the home, and the cleanliness of the children." Prior to the incidents at bar, DSS was involved with the family eight times over the course of ten years: September 2013, June 2014, March 2015, December 2019, November 2020, March 2021, February 2022, and June 2022.

Assessment [("CCA")] with a mental health and substance abuse component and follow all recommendations. [Father] shall provide a copy of [his] assessment to the Department. [Father] shall sign a consent for release of information in order for the Department to monitor [his] progress.

. . . .

10. . . . [Father] shall obtain and maintain safe and stable housing that is free from substance use.

11. . . . [Father] shall obtain a steady source of income and provide proof of his income to the Department monthly.

12. . . . [Father] shall initiate and maintain contact with the permanency planning social worker at least two times per month. . . .

13. . . . [Father] shall complete all random drug screens provided by the Department and/or any treatment provider and test negative for all illegal substances.

14. . . . [Father] shall pay child support for the care of their children.

Shortly after the adjudication, Father was incarcerated for "larceny of motor vehicle parts" on 26 December 2022 where he remained until 18 April 2023. Once released from prison, Father voluntarily attended the Triangle Residential Options for Substance Abusers Program ("TROSA"). Father completed and received certificates for several courses while attending TROSA, including: Grief and Loss Group; Healthy Relationship Group; DBT Skills Group; Grounds Maintenance Course; Parenting in the 21st Century; Seeking Safety; How to be an Effective Team Member; and Anger Management.

From March 2023 through February 2024, the trial court conducted four permanency planning hearings to evaluate Mother's and Father's progress. Initially, the trial court ordered reunification as the permanent plan and guardianship as the secondary plan for all three minor children. However, in the June 2023 permanency planning order, the trial court changed the primary plan to guardianship and the secondary plan to reunification for all three minor children. And in the September 2023 permanency planning order, the trial court changed Orla's permanent plan to adoption and her secondary plan to guardianship, concluding that DSS "should be relieved of the obligation to make reasonable efforts with the respondent/parents because such efforts clearly would be unsuccessful and/or inconsistent with the children's health and safety." In the final permanency planning order, the trial court found that Father still had not: completed a comprehensive clinical assessment ("CCA") with a mental health and substance abuse component; participated in domestic violence treatment; obtained appropriate housing for Orla; obtained and maintained employment or a steady source of income; maintained consistent contact with DSS or Orla; and written letters to Orla despite being afforded the opportunity.

On 20 November 2023, DSS petitioned the trial court to terminate Mother's and Father's parental rights over Orla on the grounds of neglect, willful failure to make progress, willful failure to pay the cost of care, and dependency. *See* N.C. Gen.

Stat. § 7B-1111(a)(1)–(3), (6) (2023).[5] At the adjudicatory phase, the trial court concluded that both Mother's and Father's parental rights could be terminated on the basis of neglect, willful failure to make progress, and dependency.[6] And at the dispositional phase, the trial court concluded that termination of Mother's and Father's parental rights was in Orla's best interests. Father timely appealed from the trial court's termination order on 1 November 2024.

After Father filed his notice of appeal, but before the matter was docketed in the appellate division, the trial court entered an amended order under Rule 60 to correct clerical errors. *See* N.C. Gen. Stat. § 1A-1, Rule 60(a) (2023) ("Clerical mistakes. – Clerical mistakes in judgments, orders or other parts of the record and errors therein from oversight or omission may be corrected by the judge at any time on his own initiative or on the motion of any party and after such notice, if any, as the judge orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate division, and thereafter while the appeal is pending may be so corrected with leave of the appellate division.").

## II. Jurisdiction

This Court has jurisdiction[7] over Father's appeal pursuant to N.C. Gen. Stat.

---

[5] DSS also alleged that Father's parental rights could be terminated under an additional ground not relevant on appeal—willful abandonment. *See id.* § 7B-1111(a)(7).

[6] Father was still a patient at TROSA at the time of the termination proceeding.

[7] "To the extent that [Father] should have appealed from the amended order, we construe [his] appeal as a petition for writ of certiorari and proceed to its merits." *In re C.P.*, 252 N.C. App. 118, 121 n.4, 801 S.E.2d 647, 650 (2017).

§§ 7A-27(b)(2) (2023) ("From any final judgment of a district court in a civil action") and 7B-1001(a)(7) (2023) (Appeal of right from "[a]ny order that terminates parental rights or denies a petition or motion to terminate parental rights").

## III. Analysis

Father raises several challenges concerning the trial court's actions at the adjudicatory phase of the termination proceeding. He argues that several findings of fact are not supported by clear, cogent, and convincing evidence. Father also maintains that the trial court incorrectly concluded his parental rights could be terminated on the grounds of neglect, willful failure to make reasonable progress, and dependency. For the reasons below, we hold the trial court did not err by concluding that Father's parental rights could be terminated on the ground of neglect.

"Our Juvenile Code provides for a two-step process for the termination of parental rights—an adjudicatory stage and a dispositional stage." *In re J.E.E.R.*, 378 N.C. 23, 26, 859 S.E.2d 191, 194 (2021). "At the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence the existence of one or more grounds for termination under N.C. [Gen. Stat.] § 7B-1111(a)." *In re T.M.B.*, 378 N.C. 683, 686, 862 S.E.2d 632, 636 (2021). "If the trial court finds the existence of one or more grounds to terminate the respondent's parental rights, the matter proceeds to the dispositional stage where the trial court must determine whether terminating the parent's rights is in the juvenile's best interests." *In re J.E.E.R.*, 378 N.C. at 26, 859 S.E.2d at 194; N.C. Gen. Stat. § 7B-1110(a) (2023).

Father's appeal thus solely concerns the adjudicatory phase of the termination proceeding, leaving the trial court's best interests determination unchallenged. *E.g., In re J.I.G.*, 380 N.C. 747, 756, 869 S.E.2d 710, 716 (2022) ("Respondent-father does not appeal the trial court's dispositional conclusion that termination of respondent-father's parental rights would serve the best interests of the children.").

## A. Findings of Fact

Father maintains that Findings of Fact Nos. 10(e), 10(w), 10(x), 10(z), 10(ee), 10(ii), 10(jj), and 10(ll) are, inter alia, not supported by clear, cogent, and convincing evidence.

"We review a trial court's adjudication under N.C. [Gen. Stat.] § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (citations omitted). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re R.G.L.*, 379 N.C. 452, 456, 866 S.E.2d 401, 408 (2021) (citations omitted).

"Unchallenged findings are deemed to be supported by the evidence and are 'binding on appeal.'" *In re K.N.K.*, 374 N.C. 50, 53, 839 S.E.2d 735, 738 (2020) (citation omitted); *see also In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) ("Findings of fact not challenged . . . are binding on appeal."). "Moreover, we review only those findings necessary to support the trial court's determination that grounds

existed to terminate respondent's parental rights." *Id.* at 407, 831 S.E.2d at 58–59;

*In re A.R.A.*, 373 N.C. 190, 195, 835 S.E.2d 417, 421 (2019) ("[W]e limit our review of

challenged findings to those that are necessary to support the district court's

determination that this ground of respondent-mother's willful failure to make

reasonable progress existed in order to terminate her parental rights.").

### 1.  *Finding of Fact No. 10(e)*

Father challenges Finding of Fact No. 10(e)[8], which provides:

> As a result of the Petition being filed in 22 JA 161, the
> minor child was adjudicated neglected and dependent.  The
> findings in the Adjudication Order, Exhibit 8, are binding
> on respondent mother and respondent father.  This Court
> took judicial notice of this order.

Father asserts he is not bound by this Finding since he did not agree to the

stipulations contained in the underlying order the trial court took judicial notice of.

He maintains that only Mother and DSS stipulated to those underlying facts.  We

disagree.

Father correctly notes that in the instant case, Mother and DSS stipulated to

certain findings of fact entered in the 21 December 2022 adjudication order.  *In re*

*T.N.H.*, 372 N.C. at 409, 831 S.E.2d at 60 (citation omitted) ("[S]tipulations constitute

judicial admissions binding on the parties and dispense with the necessity of proving

---

[8] "As a general rule, . . . any determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law. Any determination reached through logical reasoning from the evidentiary facts is more properly classified a finding of fact." *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997) (citations and quotation marks omitted).

the stipulated fact. Such stipulations continue in force for the duration of the controversy and preclude the later assertion of a position inconsistent therewith."). However, Father failed to preserve any argument pertaining to these stipulations since he did not object to them when offered or take appeal from the underlying adjudication order. *See, e.g., id.* ("[R]espondent did not appeal from the trial court's adjudication order. Therefore, respondent is bound by the doctrine of collateral estoppel from re-litigating these findings of fact.").

For example, in *In re E.P.-L.M.*, the non-appealing parent entered stipulations with the trial court. 272 N.C. App. 585, 589, 847 S.E.2d 427, 432 (2020). Although the respondent-mother did not sign the stipulations, she did not "object to the stipulations or argue that they could not be used to establish her conduct." *Id.* On appeal thereafter, respondent-mother challenged a certain finding of fact, arguing it was unsupported by the evidence. *Id.* at 595, 847 S.E.2d at 435. This Court concluded that the finding was "supported by the stipulations and, because the competency of the stipulations as evidence ha[d] not been preserved for review, that finding [was] deemed supported and binding on appeal." *Id.*

As in *In re E.P.-L.M.* and *In re T.N.H.*, Father is bound to the stipulated findings contained in the underlying order since he never objected to them and failed to appeal from the order they originated from. Accordingly, Father's argument is meritless and overruled.

## 2. *Finding of Fact No. 10(w)*

Father next challenges Finding of Fact No. 10(w), which provides:

> Respondent father was incarcerated on September 19, 2022, the day the juvenile petition was filed, but was out of custody until December 26, 2023.

Father asserts the finding is incorrect since the evidence shows: he "was incarcerated when the petition was filed; he was released in October 2022; he was incarcerated again on 26 December 2022; and he was released in April 2023." We agree.

The uncontested record shows Father was incarcerated from September 2022 through October 2022, and from December 2022 through April 2023. Accordingly, we hold Finding of Fact No. 10(w) is not supported by clear, cogent, and convincing evidence. Since this Finding is not supported by the record evidence, we must disregard it. *See In re N.G.*, 374 N.C. 891, 901, 845 S.E.2d 16, 24 (2020) (disregarding findings of fact not supported by clear, cogent, and convincing evidence); *see also, e.g, In re A.N.H.*, 381 N.C. 30, 42, 871 S.E.2d 792, 803 (2022) ("Thus, the second sentence of this finding must be disregarded as unsupported by the evidence.").

## 3. *Finding of Fact No. 10(x)*

Father next challenges Finding of Fact No. 10(x), which provides:

> Between December 26, 2023 and April 18, 2024, respondent father was incarcerated. Upon his release from incarceration, respondent father chose to go to TROSA, which is a two (2) and a half (1/2) year residential treatment program[.] Respondent father cannot bring any of his children to live with him while he is participating in this program. Respondent father was not court ordered to

> attend TROSA; he voluntarily entered into this program with the knowledge that he would be unable to parent his children during the time that he is enrolled in TROSA. Respondent father never considered attending any other programs that would have allowed him to be closer to his child and/or parent his child. Defendant resolved all his criminal matters prior to entering TROSA.

Father specifically challenges the portion of the Finding discussing his period of incarceration as well as the length of the TROSA Program. We agree.

At the termination hearing, a social worker testified several times that Father was "currently enrolled in . . . TROSA," which is a substance abuse program. She added that TROSA is "a two-and-a-half-year program" on several occasions throughout the hearing. Additionally, a prior permanency planning order and several DSS and GAL reports note the program is two-and-a-half years long. Yet, at the termination hearing, Father twice testified that TROSA was a two-year program. And a notarized letter in the record from the office coordinator at TROSA expressly states the program is two years long:

> [Father] . . . became a resident of Triangle Residential Options for Substance Abusers (TROSA) in Durham, North Carolina May 25, 2023.
>
> TROSA is an innovative, *two-year residential program* that empowers substance abusers to be productive, recovering individuals by providing comprehensive treatment, work-based vocational training, education, peer counseling/mentoring, leadership training, and aftercare.
>
> [Father] will graduate program on 5/25/2025.

(emphasis added). Thus, we cannot conclude that clear, cogent, and convincing

evidence establishes the TROSA program is two-and-a-half years long.

Furthermore, there is a lack of clear, cogent, and convincing evidence with respect to Father's period of incarceration. *See id.* Indeed, Father was not incarcerated between 26 December 2023 and 18 April 2024, as the record reflects that he was incarcerated from 26 December 2022 through 18 April 2023. The social worker corroborated this much, testifying on direct examination that Father was incarcerated from 26 December 2022 to 18 April 2023.

Accordingly, we hold there is a lack of clear, cogent, and convincing evidence supporting the challenged portions of Finding of Fact No. 10(x). *In re E.H.P.*, 372 N.C. at 392, 831 S.E.2d at 52. We therefore disregard these portions of the Finding. *See, e.g., In re N.G.*, 374 N.C. at 901, 845 S.E.2d at 24.

### 4. *Finding of Fact No. 10(z)*

Father next challenges Finding of Fact No. 10(z), which provides:

> While it is commendable that respondent father has taken steps to enroll in TROSA and treat his substance abuse issues, the child will have spent more than half of her life in foster care before respondent father will be available to parent his child. During the life of the case, respondent father has not provided information to the social worker about things he's completed at TROSA or his goals at TROSA or information about his disability and injury at work.

Father maintains a portion of the latter half of the Finding is unsupported by the evidence since a social worker testified to receiving "certificates of things he ha[d] completed" while attending TROSA. We agree insofar as Father provided certificates

of courses he completed at TROSA. However, Father does not challenge whether he updated his social worker on his goals, disability, or injury at work. *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58.

At the termination hearing, the social worker testified that Father had given her "certificates" pertaining to courses he had completed while attending TROSA. The social worker noted that she had received certificates for "DBT skills group"; "healthy relationship group"; "men's grief and loss group"; "anger management class"; "Seeking safety"; and "How to be an effective team member." Additionally, the March 2024 permanency planning order acknowledged that Father had "submitted seven certificates of completion and three letters from TROSA as exhibits . . . ." Finally, the record contains the certifications in question, demonstrating that Father had provided information to the social worker during the pendency of his case plan.

Accordingly, we hold this portion of Finding of Fact No. 10(z) is not supported by clear, cogent, and convincing evidence, and therefore, we disregard it. *See, e.g., In re N.G.*, 374 N.C. at 901, 845 S.E.2d at 24.

### 5.  *Finding of Fact No. 10(ee)*

Father next challenges Finding of Fact No. 10(ee), which provides: "Respondent father has not completed a CCA with a focus on substance abuse and mental health components." Father contends that nobody at the termination hearing testified that he had failed to complete a CCA. We disagree.

Our review of the record reveals there is clear, cogent, and convincing evidence

that Father had not completed a CCA with a focus on substance abuse and mental health components. Although Father was attending TROSA at the time of the proceeding, no evidence tends to show he had completed a CCA "and followed the recommendations," including prior permanency planning orders and the social worker's testimony at the hearing. Accordingly, Father's challenge is overruled.

### 6.  *Findings of Fact Nos. 10(ii) and 10(ll)*

Father next challenges Finding of Fact No. 10(ii), which provides:

> Respondent father has taken much longer than is reasonable to make any progress on his case plan. At this time, respondent father has not made adequate or reasonable progress on his case plan and has not addressed the issues that caused the child to come into the care of the Department. He does not [have] safe and appropriate housing for the child, he does not have income to support the child, he has not completed a CCA and followed the recommendations, and he is not able to visit the child while he is enrolled in the program that he chose. Respondent father's failure to make progress since the minor child came into the care of the Department, which is in excess of one (1) year prior to the filing of the Petition, is willful. It is further an indication of the likelihood of future neglect of the minor child.

Father asserts there is a lack of evidence that he "did not make adequate or reasonable progress on his case plan." Father maintains he made progress toward his substance abuse—one of the objectives of his case plan—by voluntarily attending TROSA. Yet, Father fails to guide us to any adequate record evidence rebutting this finding. *See* N.C. R. App. P. 28(b)(6).

Father also challenges Finding of Fact No. 10(ll), which similarly provides:

It is ultimately found that both parent's failure to make reasonable progress on their case plans is the evidence of the likelihood of the repetition of the neglect of [Orla] were she to be returned to the custody of the parents and is future indicative of the substantial risk of future neglect and risk of substantive harm. Neither of the respondent/parents have corrected the conditions that led to [Orla] coming into the care of the Department and both parents have had the opportunity to do so. There is nothing that was presented that indicates that the parents did not have the ability to comply with the elements of their case plans and such, their failure to comply is in fact willful.

Father's argument as to Finding of Fact No. 10(ll) mirrors the one above—he solely challenges the portion of the finding which states he failed to make reasonable progress on his case plan. Father maintains a similar argument on Finding of Fact No. 10(ll) as well—that his attendance at TROSA demonstrates reasonable progress to his case plan, as the program focuses on recovery from substance abuse. We disagree as to both challenges.

Although Father was attending TROSA at the time of the termination proceeding, clear, cogent, and convincing evidence shows he failed to make reasonable progress toward satisfying the requirements of his case plan, including completing a CCA, completing suitable parenting courses, obtaining stable housing, and obtaining a stable source of income. Indeed, unchallenged Findings of Fact Nos. 10(y), 10(aa), 10(bb), 10(gg), and 10(hh), note that Father: does not have a source of income; has nine months remaining in the TROSA program; will not be able to work while enrolled in the TROSA program (except for the final six months); will not be able to

obtain housing through TROSA for Orla; and had not "taken classes specifically addressing parenting a child with autism." *See In re J.S.*, 374 N.C. 811, 814, 845 S.E.2d 66, 71 (2020) (citations and quotation marks omitted) ("Unchallenged findings of fact . . . are binding on appeal.").

Moreover, at the termination hearing, the social worker testified that Father had "not made any progress," stating that he had not adequately "addressed the substance abuse, the domestic violence, the employment, [the] housing, and [the] . . . parenting" concerns which led to Orla's removal. The social worker acknowledged Father's success in that he voluntarily attended TROSA, but added that Orla "cannot go there" and "cannot live with him" while he attends. The social worker also observed that Father had yet to start "the substance use portion" of the TROSA program he was attending, and on cross-examination, the social worker recanted: "I do not have any records of any classes that he's enrolled in or assessments he has done *to address substance issues*." (emphasis added).[9]  In view of these statements, the social worker concluded that, if Orla was returned to Father's care, neglect would likely continue.

Additionally, no evidence tends to show—and Father does not assert—he has safe and appropriate housing for Orla; nor does Father assert he has income to

---

[9] Although Finding of Fact No. 10(y) states Father provided a substance abuse treatment certification to DSS, the record supports the social worker's testimony since there are *no certifications* of completion for substance abuse courses contained therein.

support Orla, or is presently able to visit her. Finally, although Father was attending TROSA at the time of the proceeding, no evidence tends to show that he had completed a CCA "and followed the recommendations," including prior permanency planning orders and the social worker's testimony at the hearing. Accordingly, Respondent's challenge is overruled. We hold there is clear, cogent, and convincing evidence supporting the challenged portions of Findings of Facts Nos. 10(ii) and 10(ll).

## 7. *Finding of Fact No. 10(jj)*

Father next challenges Finding of Fact No. 10(jj), which provides:

> Neither parent has participated in the minor child's medical appointments or occupational therapy appointments since the child has been in the care of the Department. Respondent father was able to send and receive letters to the social worker to find out information about the child's medical appointments but didn't do so.

Father solely challenges the latter portion of the finding, maintaining that "the social worker never notified him about any appointment[,] and he was not aware of any appointment," thus demonstrating that his lack of participation was not willful. We disagree, as the social worker's and Father's testimonies directly support the fact that he was able to write DSS letters—which he did not do—in order to receive updates on Orla's medical appointments.

At the termination hearing, the social worker testified to the fact that Father had not attended *any* of Orla's medical appointments since she came into DSS's care. The social worker added that Father was aware he was able to write letters to the

Department since she sent him a copy of the court order providing as such. Thereafter, Father conceded on cross-examination that he had not attended any medical or therapy appointments, he should have asked when the appointments were taking place, and he could have inquired about the appointments by sending his social worker letters:

> Q. . . . Does providing for your child mean going to doctor's appointments?
>
> A. Yes, ma'am.
>
> Q. Okay. Have you attended any doctor's appointments for [Orla] since September 19th of 2022?
>
> A. No, I have not.
>
> Q. Do you think she's been to the doctor?
>
> A. I guess she has.
>
> Q. Okay. Do you know that she has also been to occupational therapy?
>
> A. They had told me that.
>
> Q. Okay. Did you participate in any of those appointments?
>
> A. I did not know when they was, ma'am.
>
> Q. So how are you supposed to know when appointments are scheduled? What do you think the thing to do is?
>
> A. Ask.
>
> Q. Did you ask?
>
> A. Whenever I was at court, yeah. She said it was coming up because I signed a paper –

Q. Okay.

A. -- and she said she would let me know. I never knew anything about it.

Q. Okay. So did you contact the social worker and say, "Hey, you told me there was an appointment. I want to participate. I want a phone call. I want a Webex"?

A. Yeah, and she told me it went well.

Q. Did you participate in those appointments though?

A. I didn't never know whenever one was.

Q. Okay. And how many appointments . . . has [Orla] had since she's been in the care of the Department?

A. I don't know.

Q. Why don't you know?

A. Well, for one, ma'am, I don't – I'm not allowed to -- I don't walk around with a phone to be able to just call somebody and just ask them when this and that. She has the e-mail where she can send e-mails and contact me. I can't just walk in there and pick up the phone. It's not like that there.

Q. So are you able to e-mail back?

A. No, ma'am

Q. Okay. So are you saying that it's her obligation to inform you of what's going on with your child? Is that what you're saying?

A. As of right now, I mean with me being at TROSA. I mean how else am I supposed to find out?

Q. You're able to send letters, aren't you[ ]?

A. Yeah.

Q. Okay. Have you written any letters to your social worker saying, "Hey, please send me a list of [Orla's] appointments so I can know what going on. Please send me copies of medical records"?

A. No, ma'am.

Q. You haven't done that?

A. No.

Accordingly, Father's argument is meritless and overruled, as his own testimony, coupled with the social worker's, demonstrates how and when Father was notified about his ability to send DSS letters. *See id.*

## B. Termination Ground—Neglect

Father asserts the trial court erroneously concluded that it could terminate his paternal rights over Orla on the basis of neglect, willful failure to make progress, and dependency. Father maintains the trial court's adjudicatory findings do not support its conclusions. We disagree since the trial court's findings adequately support the termination ground of neglect enumerated in N.C. Gen. Stat. § 7B-1111(a)(1), and only one ground is required for this Court to uphold a trial court's termination order. *See, e.g., In re E.H.P.*, 372 N.C. at 395, 831 S.E.2d at 53 ("[A]n adjudication of any single ground in N.C. [Gen. Stat.] § 7B-1111(a) is sufficient to support a termination of parental rights. Therefore, we need not address respondent's contention that the trial court erred in determining that grounds likewise existed to support termination based on willful failure to pay child support."); *see also In re P.L.P.*, 173 N.C. App. 1,

8, 618 S.E.2d 241, 246 (2005) (citation and quotation marks omitted) ("[W]here the trial court finds multiple grounds on which to base a termination of parental rights, and an appellate court determines there is at least one ground to support a conclusion that parental rights should be terminated, it is unnecessary to address the remaining grounds.").

"We review a trial court's adjudication under N.C. [Gen. Stat.] § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re E.H.P.*, 372 N.C. at 392, 831 S.E.2d at 52. "The trial court's conclusions of law are reviewable de novo on appeal." *In re Z.A.M.*, 374 N.C. 88, 94, 839 S.E.2d 792, 797 (2020) (citations omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *In re C.V.D.C.*, 374 N.C. 525, 530, 843 S.E.2d 202, 205 (2020) (citation omitted) (alteration in original).

"Pursuant to Section 7B-1111(a)(1), termination of parental rights is proper where a district court finds a parent has neglected his or her child to such an extent that the child is a 'neglected juvenile.'" *In re Z.V.A.*, 373 N.C. 207, 211, 835 S.E.2d 425, 429 (2019) (citation omitted). A neglected juvenile is defined under Chapter 7B as "[a]ny juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker does any of the following":

> a. Does not provide proper care, supervision, or discipline.
>
> b. Has abandoned the juvenile, except where that juvenile

is a safely surrendered infant as defined in this Subchapter.

c. Has not provided or arranged for the provision of necessary medical or remedial care.

d. Or whose parent, guardian, or custodian has refused to follow the recommendations of the Juvenile and Family Team made pursuant to Article 27A of this Chapter.

e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.

f. Has participated or attempted to participate in the unlawful transfer of custody of the juvenile under G.S.14-321.2.

g. Has placed the juvenile for care or adoption in violation of law.

N.C. Gen. Stat. § 7B-101(15)(a)–(g) (2023).

"[I]f the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167. "In such cases, a trial court may terminate parental rights based upon prior neglect of the juvenile if the trial court *finds by clear and convincing evidence a probability of repetition of neglect* if the juvenile were returned to [his or] her parents." *In re M.B.*, 382 N.C. 82, 86, 876 S.E.2d 260, 264 (2022) (citation omitted) (alteration in original).

"When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. at 212,

835 S.E.2d at 430. In addition, "a trial court may [also] consider 'whether the parent has made any meaningful progress in eliminating the conditions that led to the removal of the children.'" *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 265 (citations omitted). "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding.*" *In re Z.V.A.*, 373 N.C. at 212, 835 S.E.2d at 430 (quoting *In re Ballard,* 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984)). That said, these "factors alone do[ ] not amount to making the determination itself. After noting these factors, the trial court must then distinctly determine a parent's likelihood of neglecting a child in the future." *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 265. If "the trial court fails to distinctly determine that there is a likelihood of future neglect, 'the ground of neglect is unsupported by necessary findings of fact.'" *Id.* at 86–87, 876 S.E.2d at 265 (citation omitted).

In the instant case—disregarding those findings unsupported by clear, cogent, and convincing evidence, analyzed in section A—we hold the trial court's remaining adjudicatory findings adequately support termination based on neglect. *See, e.g., In re M.Y.P.*, 378 N.C. 667, 676, 862 S.E.2d 773, 780 (2021) ("Regardless of our conclusion that the above findings of fact are unsupported, such error is harmless as the remaining findings in the trial court's order still support its conclusion that respondent's rights were subject to termination based on neglect."); *see also In re A.J.*, 386 N.C. 409, 412, 904 S.E.2d 707, 711 (2024) ("We have repeatedly articulated what an appellate court must do if it determines that a finding of fact lacks sufficient

support in the record: the reviewing court must disregard that finding and examine whether the remaining findings support the trial court's determination.").

In its order, the trial court first found that Orla was previously adjudicated as neglected in case file 22 JA 161—demonstrating a showing of past neglect. *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167. With respect to the likelihood of future neglect, the trial court also found that *at the time of the termination proceeding*, and in light of his failure to make reasonable progress, Father was likely to neglect the children in the future:

> [Father] has taken much longer than is reasonable to make any progress on his case plan. *At this time*, [Father] has not made adequate or reasonable progress on his case plan and has not addressed the issues that caused the child to come into the care of the Department. He does not [have] safe and appropriate housing for the child, he does not have income to support the child, he has not completed a CCA and followed the recommendations, and he is not able to visit the child while he is enrolled in the program that he chose. Respondent father's failure to make progress since the minor child came into the care of the Department, which is in excess of one (1) year prior to the filing of the Petition, is willful. *It is further an indication of the likelihood of future neglect of the minor child.*
>
> . . . .
>
> *It is ultimately found that both parent[s'] failure to make reasonable progress on their case plans is the evidence of the likelihood of the repetition of the neglect of [Orla] were she to be returned to the custody of the parents and is future indicative of the substantial risk of future neglect and risk of substantive harm.* Neither of the respondent/parents have corrected the conditions that led to [Orla] coming into the care of the Department and both parents have had the

> opportunity to do so. There is nothing that was presented that indicates that the parents did not have the ability to comply with the elements of their case plans and such, their failure to comply is in fact willful.

(emphasis added). These Findings highlight that Father was likely to neglect Orla in the future in light of the fact that for well over a year, he: was unable to "provide proper care, supervision, or discipline"; and had failed to "follow the recommendations of the Juvenile and Family Team[.]" N.C. Gen. Stat. § 7B-101(15); *In re M.A.*, 374 N.C. 865, 870, 844 S.E.2d 916, 921 (2020) ("A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect."). Moreover, the trial court noted that it considered Father's ability to care for Orla at the time of the termination proceeding, *In re Z.V.A.*, 373 N.C. at 212, 835 S.E.2d at 430, and made an ultimate finding as to the likelihood of future neglect after analyzing the requisite factors. *See In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 265 ("After noting these factors, the trial court must then distinctly determine a parent's likelihood of neglecting a child in the future.").

Additionally, in unchallenged Findings of Fact Nos. 10(y), 10(aa), 10(bb), 10(gg), and 10(hh), the trial court noted that Father: does not have a source of income; has nine months remaining in the TROSA program; will not be able to work while enrolled in the TROSA program (except for the final six months); will not be able to obtain housing through TROSA for Orla; failed to write letters to Orla despite being given the opportunity to do so from May to December 2023; failed to "request that his

visitation be reinstated, even though each permanency planning order provides that the parties can file motions to review the visitation plan"; and failed to visit Orla since she was nine months old—all of which speak to his likelihood of neglecting Orla moving forward. *See In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58 ("Findings of fact not challenged . . . are binding on appeal."). The unchallenged findings also demonstrate that Father failed update his social worker on "his goals at TROSA or information about his disability and injury at work"—a requirement of his case plan. *See id.*

Moreover, unlike incarceration, Father voluntarily entered into TROSA "with the knowledge that he would be unable to parent his children during the time that he [was] enrolled," and "never considered attending any other programs that would have allowed him to be closer to his child and/or parent his child." *See generally In re T.N.H.*, 372 N.C. at 412–13, 831 S.E.2d at 61–62. Father conceded as much during the termination hearing, testifying as follows on direct and cross-examination:

> Q. And you're not ordered to go to TROSA; correct?
>
> A. No, sir.
>
> Q. So it's a voluntary –
>
> A. Yes, sir.
>
> . . . .
>
> Q. Well, you chose TROSA as the program to attend; is that correct?
>
> A. Yeah.

Q. Okay. And you knew when you chose it, that it was going to be two-and-a-half-year program?

A. Two-year program.

Q. Two-year program, okay. I'm sorry, two-year program. Is that correct you knew that?

A. Yeah.

Q. And did you look into any other programs that would have allowed you to take your child with you or be closer to your child so that you could visit with her?

A. I haven't had a -- no, I was incarcerated.

Q. So you looked into one single solitary program?

A. That was the only one that I could -- I knew about. It's the only one I could find out about while I was incarcerated.

Q. Okay. And when you went to TROSA, you actually got out of jail, correct, to go to TROSA? Your criminal charges were resolved?

A. Yeah.

Q. So why didn't you take the opportunity to get out of jail, look for a program close by or someplace you could take your child? Why didn't you do that?

A. Because whenever I was in court, they said go to TROSA because I presented it.

Q. Okay. So you didn't take the time to look for a program --

A. No, ma'am.

Q. -- that would allow you to take your child; is that correct?

A. Yeah.

Finally, the trial court considered the change in circumstances experienced by Father since the original neglect adjudication, *In re Z.V.A.*, 373 N.C. at 212, 835 S.E.2d at 430, acknowledging his history throughout DSS's involvement, his success at TROSA, and his resolution of his criminal charges:

> v. Respondent father entered into a case plan or Out of Home Family Services Agreement with the Department on September 28, 2022. Respondent father agreed to maintain contact with the social worker; complete age appropriate parenting classes; complete a Comprehensive Clinical assessment and follow all recommendations; enroll in and complete anger management program; obtain and maintain stable housing; and obtain and maintain a steady source of income.
>
> . . . .
>
> x. . . . Respondent father was not court ordered to attend TROSA; he voluntarily entered into this program with the knowledge that he would be unable to parent his children during the time that he is enrolled in TROSA. Respondent father never considered attending any other programs that would have allowed him to be closer to his child and/or parent his child. Defendant resolved all criminal matters prior to entering TROSA.
>
> . . . .
>
> z. While it is commendable that respondent father has taken steps to enroll in TROSA and treat his substance abuse issues, the child will have spent more than half of her life in foster care before respondent father will be available to parent his child. . . .

Viewing the remaining findings together, there is ample, clear, cogent, and convincing evidence supporting the trial court's conclusion—that Father's parental rights were subject to termination on the basis of neglect. *See, e.g., In re M.Y.P.*, 378

N.C. at 678, 862 S.E.2d at 781 ("[T]he trial court's remaining findings of fact support its conclusion of law that a ground existed to terminate respondent's parental rights pursuant to N.C. [Gen. Stat.] § 7B-1111(a)(1). Accordingly, we affirm the trial court's determination that a ground existed to terminate respondent's parental rights based on neglect."). Accordingly, we hold the trial court did not commit error by concluding that grounds supported the termination of Father's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1). Father's final assignment of error is overruled.

## IV.  Conclusion

For the above reasons, we hold that the trial court did not commit error by terminating Father's parental rights on the basis of neglect. Since only one ground is required to uphold a trial court's termination of a parent's parental rights, we decline review of the other grounds noted by the trial court and challenged on appeal by Father.

AFFIRMED.

Judge CARPENTER concurs.

Judge TYSON concurs in part and dissents in part by separate opinion.

Report per Rule 30(e).

No. COA25-93 – *In re O.R.L.*

TYSON, Judge, concurring in part and dissenting in part.

The majority's opinion correctly holds the trial court's findings of fact 10(w), 10(x), and 10(z) as unsupported by clear, cogent, and convincing evidence. We unanimously agree these findings are unsupported and properly disregarded as support for the trial court's conclusions of law, which we review *de novo*.

The majority's opinion errs in its conclusion findings of fact 10(jj) and 10(ll) are supported by clear, cogent, and convincing evidence. The majority's opinion improperly affirms the termination of parental rights of Respondent solely on the basis of neglect. Without supported findings, the conclusion to terminate Respondent's parental rights on the grounds of neglect is prejudicial error and the order is properly vacated and remanded. I vote to vacate the district court's order terminating Respondent's parental rights and to remand. I respectfully dissent.

## I.    Findings of Fact

We unanimously agree the trial court's findings of fact, 10(w), 10(x), and 10(z), are unsupported by clear, cogent, and convincing evidence. The majority's decision improperly accepts findings of fact 10(jj) and 10(ll), which are also unsupported by clear, cogent, and convincing evidence. These "findings" are also properly disregarded, and do not support the trial court's conclusions.

### A.  Finding 10(jj)

Finding of fact 10(jj) provides:

> Neither parent has participated in the minor child's medical appointments or occupational therapy appointments since the child has been in the care of the Department. Respondent father was able to send and receive letters to the social worker to find out information about the child's medical appointments but didn't [sic] do so.

Respondent could not have attended Orla's medical or other appointments while he was incarcerated or while a resident at TROSA, other than during the brief period from October until 26 December 2022, when he was not incarcerated or a resident at TROSA. The same would be true if he was ill, hospitalized, incapacitated, or incarcerated for this brief period. Presuming Respondent never sought to attend his daughter's medical or other appointments during this limited October until 26 December period in 2022, no evidence tends to show DSS made him aware of or that Orla actually attended any medical and occupational therapy appointments during this limited period Respondent purportedly missed. The unsupported portions in this finding are also properly disregarded.

### B. Finding 10(ll)

Finding of fact 10(ll) provides:

> It is ultimately found that both parent's failure to make reasonable progress on their case plans is the evidence of the likelihood of the repetition of the neglect of O[rla] were she to be returned to the custody of the parents and is future indicative of the substantial risk of future neglect and risk of substantive harm. Neither of the respondent/parents have corrected the conditions that led to O[rla] coming into the care of the Department and both parents have had the opportunity to do so. There is nothing

> that was presented that indicates that the parents did not
> have the ability to comply with the elements of their case
> plans and such, their failure to comply is in fact willful.

Respondent's arrest at Orla's school under the *ex parte* DVPO mother had secured and his incarceration limited his ability to visit his daughter. Addressing and seeking to overcome his substance abuse issues upon release from incarceration was specifically a part of Respondent's plan with DSS. This unsupported finding concerns Respondent's purported failure to make reasonable progress, not neglect, as the ground the majority's opinion affirms.

The trial court unlawfully shifted the burden of proof to the parents by finding: "There is nothing that was presented that indicates that the parents did not have the ability to comply with the elements of their case plans." The statutory primary stated goal is reunification of the family. The statute presumes the goal will be met. It is clearly DSS's burden to show a parent's ability to comply and his "stubborn resistance" to support willfulness in his asserted failures. N.C. Gen. Stat. § 7B-1111(a) (2023). Other requirements imposed by Respondent's plan were not argued as being unaddressed.

DSS and the majority's opinion also faults Respondent for seeking intensive and the best available treatment for his substance abuse addictions as a resident at TROSA, as such treatment is required by his plan. DSS and the trial court asserts Respondent could have chosen to attend a different program and he had not been court ordered to attend TROSA. This notion creates a dangerous precedent against

parents, who are earnestly seeking the best and proper treatment, to reduce or eliminate the reasons for their children being removed and to meet the statutory goal of being reunified with their children. The unsupported portions in this finding, as they refer to Respondent, are properly disregarded and do not support neglect existed at termination or a probability of future neglect as required by precedents.

## II.    Termination of Respondent's Parental Rights

The majority's opinion improperly affirms the termination of parental rights of Respondent solely on the basis of neglect. The district court erred by terminating Respondent's parental rights for neglect and purported failure to make reasonable progress. "[A] finding of only one ground is necessary to support a termination of parental rights." *In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019). Disregarding unsupported and erroneous findings, and reviewing the remainder, the order is properly vacated.

### A. Standard of Review

"The termination of a parent's parental rights in a juvenile matter is a two-stage process consisting of an adjudicatory stage and a dispositional stage." *In re C.B.*, 375 N.C. 556, 559, 850 S.E.2d 324, 327 (2020). "At the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence the existence of one or more grounds for termination under N.C. Gen. Stat. § 7B-1111(a) (2023)." *In re A.B.C.*, 374 N.C. 752, 757, 844 S.E.2d 902, 907 (2020) (citation omitted).

Only after the trial court finds supported grounds exist to support a conclusion

to terminate parental rights by the petitioner's carrying and meeting the requisite burden of proof, does it move to the dispositional stage to determine whether termination of parental rights would be in the best interests of the juvenile. *Id.* In the dispositional stage, the trial court's "best interests" determination is reviewed on appeal for abuse of discretion. *In re A.U.D.*, 373 N.C. 3, 6, 832 S.E.2d 698, 700 (2019).

A trial court abuses its discretion when the ruling is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015). "The trial court's conclusions of law are review[ed] *de novo*." *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019) (citation omitted).

## B. Dependency

Our General Assembly clearly mandated: "The burden in these proceedings is on the petitioner or movant to prove the facts justifying the termination by clear and convincing evidence." N.C. Gen. Stat. § 7B-1111(b) (2023). If relevant, competent, and material evidence is admitted and supports the findings, supported facts are "binding on appeal." *In re McCabe*, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003) (citations omitted).

A trial court may terminate parental rights only after lawfully satisfying the statutory mandates and concluding "the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. 7B-101, and that there is a reasonable probability

that the incapability will continue for the foreseeable future." N.C. Gen. Stat. § 7B-1111(a)(6) (2023).

Incapability "may be the result of substance abuse . . . or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement." *Id.*

Respondent asserts the district court erred in terminating his parental rights because his "incapacity" due to his voluntary substance abuse treatment at TROSA has a defined ending date. In the case of *In re A.L.S.*, 375 N.C. 708, 714, 851 S.E.2d 22, 27 (2020), a parent's parental rights were terminated for dependency where she was to be incarcerated for twenty-two additional months, and she "would be "incapable of providing for the proper care and supervision of the children for the foreseeable future[.]" The Supreme Court further held:

> The fact that respondent-mother faces an extended period of incarceration regardless of the exact date upon which she is scheduled to be released provides ample support for the trial court's determination that she was incapable of providing for the proper care and supervision of the children and that there was a reasonable probability that her incapability would continue for the foreseeable future.

*Id.*

Respondent was unavailable to reunify due to seeking in-patient treatment to ameliorate the reasons that led to his children's removal and his residency at TROSA. He had resolved all pending criminal matters and incarceration prior to admission. As Respondent had voluntarily sought and attended residential treatment in support

of his plan, and he is free to leave at any time, no evidence tends to show or support any purported incapacity to parent would continue "for the foreseeable future." *Id.* No finding or evidence supports a finding or conclusion "the parent lacks an appropriate alternative child care arrangement," as DSS is not seeking to terminate Respondent's parental rights to his other children, who were removed at the same time and on the same grounds. N.C. Gen. Stat. § 7B-1111(a)(6) (2023).

## C. Neglect

Respondent argues the district court erred in terminating his parental rights to Orla for neglect. To terminate parental rights for this ground the district court must find and conclude the parent has neglected the juvenile, as defined by N.C. Gen. Stat. § 7B-101(15):

> [A] juvenile who: (a) does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or (b) who has been abandoned; (c) or who is not provided necessary medical care; or (d) who is not provided necessary remedial care; or (e) who lives in an environment injurious to the juvenile's welfare; . . . or (g) who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C. Gen. Stat. § 7B-101(15) (2023).

A conclusion a juvenile is neglected "must be based on evidence showing neglect at the time of the termination proceeding." *In re Young*, 346 N.C. 244, 248,

485 S.E.2d 612, 615 (1997) (citation omitted).

Neglect exists at the time of a termination hearing when a child has not been in the custody of the parent for a significant period of time prior to the termination hearing when there is a showing of (1) "a past adjudication of neglect," and (2) "a probability of repetition of neglect if the juvenile were returned to [the parent]." *In re Reyes*, 136 N.C. App. 812, 815, 526 S.E.2d 499, 501 (2000) (citation omitted).

The trial court found Respondent was still enrolled in TROSA and receiving in-patient substance abuse treatment in support of his plan. No evidence tends to show and the district court did not make findings tending to show a probability the conditions, which led to his child's removal, would continue after Respondent's treatment and release from TROSA. The conclusion of neglect is unsupported by the mandated findings of fact. *See In re E.L.E.*, 243 N.C. App. 301, 308, 778 S.E.2d 445, 450-51 (2015) ("[A]bsence of this necessary finding [of a probability of a repetition of neglect] requires reversal.").

## D. Failure to Make Reasonable Progress

The majority's opinion only addresses and affirms the termination of respondent's parental rights on the sole ground of neglect. Respondent further argues the district court erred by terminating his parental rights for willful failure to make reasonable progress to ameliorate the conditions that led to his children's removals.

Courts may terminate a parent's rights to exclusive care, custody, and control of their child only after certain limited, statutorily-defined grounds are proven by the

petitioner meeting the required burden of proof. N.C. Gen. Stat. § 7B-1111 (2023). A court may terminate parental rights if the evidence and findings clearly and convincingly demonstrate and support a conclusion:

> The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. No parental rights, however, shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.

N.C. Gen. Stat. § 7B-1111(a)(2) (2023).

Our Supreme Court has outlined the analysis trial courts must perform before terminating a parent's parental rights pursuant to this ground:

> Termination under this ground requires the trial court to perform a two-step analysis where it must determine by clear, cogent, and convincing evidence whether (1) a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, *and* (2) the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.

*In re Z.A.M.*, 374 N.C. 88, 95, 839 S.E.2d 792, 797 (2020) (emphasis supplied) (citation omitted).

"[A] respondent's prolonged inability to improve her situation, despite some efforts in that direction, will support a finding of willfulness regardless of her good intentions, and will support a finding of lack of progress . . . sufficient to warrant termination of parental rights under section 7B-1111(a)(2)." *In re J.W.*, 173 N.C. App.

450, 465-66, 619 S.E.2d 534, 545 (2005) (citation and internal quotation marks omitted).

"Leaving a child in foster care or placement outside the home is willful when a parent has the ability to show reasonable progress, but is unwilling to make the effort." *In re A.J.P.*, 375 N.C. 516, 525, 849 S.E.2d 839, 848 (2020) (citation, internal quotation marks, and alterations omitted).

Our Supreme Court stated:

> Parental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2). However, in order for a respondent's noncompliance with her case plan to support the termination of her parental rights, there must be a nexus between the components of the court-approved case plan with which the respondent failed to comply and the conditions which led to the child's removal from the parental home.

*In re J.S.*, 374 N.C. 811, 815-16, 845 S.E.2d 66, 71 (2020) (citation, internal quotation marks, and alterations omitted).

The Supreme Court further explained a parent's non-compliance with case plan conditions are relevant, "provided that the objectives sought to be achieved by the case plan provision in question address issues that contributed to causing the problematic circumstances that led to the juvenile's removal from the parental home." *In re T.M.L.*, 377 N.C. 369, 379, 856 S.E.2d 787, 793 (2021) (citation and quotation marks omitted).

Here, the trial court's termination order includes an unsupported statement

"Respondent father has taken much longer than is reasonable to make any progress on his case plan." However, the 13 March 2024 permanency planning order finds Respondent had "submitted seven certificates of completion and three letters from TROSA as exhibits at today's hearing" in support of his progress on the case plan.

The district court's order appears to penalize Respondent for choosing and attending in-patient substance abuse treatment. "Respondent father was not court ordered to attend TROSA; he voluntarily entered into this program with the knowledge that he would be unable to parent his children during the time that he is enrolled in TROSA."

Respondent sought to address and overcome his substance abuse, which contributed to his child's removal, and which is an important part of his plan with DSS at TROSA. Respondent was still enrolled at TROSA. "[A] trial judge should refrain from finding that a parent has failed to make 'reasonable progress . . . in correcting those conditions which led to the removal of the juvenile' simply because of his or her 'failure to fully satisfy all elements of the case plan goals.'" *In re B.O.A.*, 372 N.C. 372, 385, 831 S.E.2d 305, 314 (2019) (citation omitted).

The district court had made supported findings Respondent was enrolled in TROSA, had completed required classes, and had maintained contact with DSS while enrolled in TROSA. Respondent and TROSA personnel filed reports, certificates, and letters with DSS. The district court's finding and conclusion Respondent "has not made reasonable progress under the circumstances to correct the conditions which

led to the removal of the child" is unsupported, and directly contradicts supported findings in the 13 March 2024 permanency planning order. *In re Z.A.M.*, 374 N.C. at 95, 839 S.E.2d at 797; *see In re B.O.A.*, 372 N.C. at 385, 831 S.E.2d at 314.

Our Supreme Court has recently held:

> [W]hen an appellate court determines that the trial court's findings of fact are insufficient, the court must examine whether there is sufficient evidence in the record that could support the necessary findings. If so, the appropriate disposition is to vacate the trial court's order and remand for entry of a new order. This permits the trial court, as finder of fact, to decide whether to enter a new order with sufficient findings based on the record or to change its conclusions of law because the court cannot make the necessary findings.

*In re A.J.*, 386 N.C. 409, 417, 904 S.E.2d 707, 715 (2024) (internal citations omitted).

### III. Conclusion

We unanimously agree the trial court's findings of fact 10(w), 10(x), and 10(z) are unsupported by clear, cogent, and convincing evidence and cannot support termination of Respondent's parental rights for neglect. These findings are properly disregarded as support for the trial court's conclusions of law, which we review *de novo*. There is no supported finding of a probability of future neglect upon Respondent's completion of his intensive treatment at TROSA and his demonstrated record of progress in compliance with his DSS plan, as was found in the court's previous orders.

The district court erred in terminating Respondent's parental rights under

N.C. Gen. Stat. § 7B-1111(a) (1), (2), and (6) (2023). *Id.* The termination order is properly vacated, and this cause is remanded for further proceedings. I concur in part and respectfully dissent in part.